MARYLAND CASUALTY COMPANY, demandante y recurrida, *v.* BANCO POPULAR DE PUERTO RICO, demandado y recurrente.

*Número:* R-64-8      *Resuelto:* 10 de mayo de 1965

*Gabriel de la Haba, Rafael Baragaño, Jr., Garrard Harris, Ramón Mellado González, Rafael J. Baragaño Amadeo* y *Eduardo C. Baragaño Amadeo,* abogados del recurrente; *Rivera Zayas, Rivera Cestero & Rúa* y *Francisco Agrait Oliveras,* abogados de la recurrida.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Los hechos de este caso fueron sometidos al Tribunal de instancia mediante una estipulación aprobada por ambas

partes. La estipulación es un documento extenso. Lo que sigue es una síntesis de su contenido.

La demandante es una corporación extranjera autorizada para hacer negocios de seguros en Puerto Rico. El demandado es un banco doméstico. El Gobierno de la Capital tenía, durante el término comprendido entre el 1° de julio de 1959 y el 30 de junio de 1960, una cuenta corriente en el Banco demandado. Durante dicho período de tiempo estaba en vigor una fianza, siendo la demandante la aseguradora y el Gobierno de la Capital el asegurado, para responder a éste de cualquier pérdida que sufriera como consecuencia de desfalco, falsificación o malversación de fondos, por acción u omisión de sus empleados.

Jaime Rijos Cruz era Subauditor Auxiliar de la Capital y tenía a su cargo la preparación de las nóminas. Durante el término antes mencionado Rijos Cruz "preparó nóminas falsas incluyendo en las mismas nombres de personas inexistentes y pasó las nóminas al Tesorero y al Auditor de la Capital de Puerto Rico, José S. García y José Rodríguez Olmo, quienes a base de las nóminas preparadas, sin conocimiento de la actuación del mencionado Subauditor Auxiliar, Jaime Rijos Cruz, y sin tener conocimiento de que dichas nóminas eran falsas, expidieron y firmaron en representación del Gobierno de la Capital de Puerto Rico, como funcionarios autorizados al efecto, veinte y cuatro cheques contra la cuenta del Gobierno de la Capital de Puerto Rico en la oficina principal del banco demandado, a favor de personas inexistentes, por un total de $7,002.00."

Rijos Cruz endosó fraudulentamente 23 de dichos cheques, escribiendo al dorso de los mismos los nombres de los tomadores inexistentes y los cobró en el Banco Popular. El cheque restante lo negoció endosándolo en igual forma y entregándolo a una firma comercial de San Juan. El demandado Banco Popular cargó dichos 24 cheques a la cuenta del Gobierno de la Capital. Los dos primeros cheques los cargó en julio de 1959

y por espacio de 10 meses consecutivos posteriores cargó los otros 22 cheques restantes, siendo los últimos cheques cargados en junio de 1960. El Banco envió mensualmente los estados de cuenta y los cheques cancelados al Gobierno de la Capital. Es deber del Tesorero Municipal examinar los estados de cuenta mensuales que someten los bancos.

La Capital no notificó al Banco objeción alguna relacionada con los cargos hechos en su cuenta debido a los referidos cheques. La primera reclamación por el importe de los cheques que se hizo al Banco la formuló la demandante en 10 de septiembre de 1962. Posteriormente la demandante pagó al Gobierno de la Capital el importe de los cheques, subrogándose así en los derechos que le correspondían al Gobierno de la Capital contra el demandado. El demandado se ha negado a pagarle al Gobierno de la Capital y a la demandante los $7,002.00 que son motivo de este pleito. Aquí termina la síntesis de la estipulación.

La compañía aseguradora demandó al Banco Popular en cobro de dinero por la suma antes mencionada, más intereses, costas y honorarios de abogado.

El Tribunal Superior llegó a las conclusiones de derecho que a continuación se resumen: (1) La ley dispone que un cheque es pagadero al portador cuando es pagadero a la orden de persona ficticia o que no existe, y ese hecho era conocido por la persona que lo otorgó. (2) La doctrina del tomador ficticio no es aplicable a los hechos de este caso porque las personas que a nombre del municipio expidieron los cheques no sabían que los mismos eran pagaderos a la orden de personas ficticias o inexistentes. (3) Un depositante viene obligado a notificar al banco la existencia de endosos falsos tan pronto los descubra, pero el hecho de que el banco envíe mensualmente un estado de cuenta y los cheques cancelados al depositante no establece la presunción de que el depositante descubrió o pudo haber descubierto que los endosos eran falsos. (4) La defensa de prescripción levantada por el Banco carece

de méritos. (5) Habiéndose subrogado la demandante en los derechos del Gobierno de la Capital, aquélla tiene derecho a que el demandado le reembolse los $7,002.00 que ella pagó al municipio.

A tenor con dichas conclusiones el Tribunal de instancia condenó al demandado a pagar a la demandante la suma de $7,002.00 más las costas. El demandado recurrente solicita que revoquemos al Tribunal Superior por los siguientes fundamentos:

1. Porque el depositante fue negligente al no descubrir y notificar al banco con prontitud los cargos hechos contra su cuenta debido a los cheques en cuestión.

2. Porque a tenor con la Ley de Instrumentos Negociables dichos cheques deben considerarse como cheques pagaderos al portador y por lo tanto el Banco actuó correctamente al pagarlos.

3. Porque la acción está prescrita en cuanto a todos los cheques pagados antes del 9 de noviembre de 1959.

Discutiremos los errores señalados en orden inverso al que están arriba transcritos. Alega el demandado que la acción está prescrita en cuanto a todos los cheques pagados antes del 9 de noviembre de 1959. Argumenta que es de aplicación el Art. 946 del Código de Comercio, 10 L.P.R.A. sec. 1908, y no el 1864 del Código Civil, 31 L.P.R.A. sec. 5294. Un planteamiento idéntico ya fue resuelto adversamente para el demandado en *Portilla* v. *Banco Popular*, 75 D.P.R. 100, 126–128 (1953). Allí expresamos que la acción en estos casos no procede de letras de cambio, ni de cheques, ni de otros documentos de cambio, sino que es una en cobro de dinero, basada en un contrato de préstamo (la cuenta corriente) y en una relación de acreedor y deudor. Sobre estos extremos véase *Portilla*, supra, a las págs. 113–114. También Vance, *On Insurance*, 3ra. ed., págs. 786 y ss.; Velázquez, *Las Obligaciones Según el Derecho Puertorriqueño* (1964), págs. 206 y ss.; Anotación, *"Right of third persons to be subrogated to*

*depositor's claim against bank on account of the latter's payment of forged or raised checks,"* 77 A.L.R. 1057; Anotación, *"Right of surety who discharges obligation due to government, to be subrogated to rights of latter against third persons,"* 24 A.L.R. 1523. En algunas jurisdicciones norteamericanas se ha legislado para fijar un término específico de prescripción en estos casos. Ello se entiende porque en ausencia de un derecho supletorio (contrario a lo que ocurre en las jurisdicciones en donde tenemos el Código Civil) era necesario fijar algún término prescriptivo. Véase al efecto la Anotación, *"Construction and effect of statute relieving bank from liability to depositor for payment of forged or raised check unless within specified time after return of voucher representing payment he notifies bank as to forgery or raising,"* 50 A.L.R. 2d. 1115. No se cometió el error señalado.

El segundo planteamiento del recurrente consiste, como hemos visto, en sostener que los cheques deben considerarse pagaderos al portador y que por ello el Banco actuó correctamente al pagarlos. Invoca el Art. 362 del Código de Comercio, 19 L.P.R.A. sec. 10, que es a su vez el 10 de nuestra Ley de Instrumentos Negociables (Leyes, 1930, pág. 177). Dicho artículo, en lo pertinente, lee como sigue:

"10. Un documento será pagadero al portador . . . (3) Cuando es pagadero a la orden de persona ficticia o que no existe y ese hecho era conocido por la persona que lo otorgó en esa forma."

Esa disposición, que procede de la Sec. 9 (3) de la Ley Uniforme de Instrumentos Negociables, 5 U.L.A. Sec. 9 (3), recogió la doctrina del tomador ficticio del derecho común anglosajón (*fictitious payee rule*).[1] Dicha doctrina tuvo su origen en una serie de casos ingleses del siglo 18 que surgie-

---

[1] Como en Puerto Rico operan los dos grandes derechos occidentales, el civil continental europeo y el angloamericano, nos vemos precisados a distinguir con frecuencia entre el derecho común angloamericano y el español. La ciencia jurídica, como toda ciencia, exige precisión.

ron con motivo de la quiebra de dos firmas comerciales. (²)
En *Minet* v. *Gibson, supra,* escolio 2, que es el más conocido
de los tres casos originales pues fue el primero en llegar a la
Cámara de los Lores sobre esta cuestión, resolvió que siendo
el instrumento allí en litigio uno pagadero a persona inexis-
tente y siendo ello de conocimiento del librador y del aceptan-
te, el documento debía considerarse pagadero al portador. Se
razonó que conociendo ambas partes el carácter ficticio del
tomador, su intención no podía ser otra que el documento
fuese considerado como uno pagadero al portador. Luego, en
*Bennet* v. *Farnell,* 1 Camp. 130, 170 Eng. Rep. 902 (K.B.
1807) se resolvió que un instrumento pagadero a nombre de
un tomador ficticio era nulo a menos que el aceptante supiese
que el tomador era ficticio, imponiéndosele así definitivamente
esa condición a la referida doctrina. Pero al aprobarse en
Inglaterra el Bills of Exchange Act de 1882 se amplió la
doctrina al disponerse en la Sec. 7(3) de dicha ley que "cuando
el tomador sea una persona ficticia o inexistente la letra
podrá ser considerada como pagadera al portador." Se eliminó,
pues, el requisito de que el carácter ficticio del tomador tuviese
que ser conocido por el aceptante. Así lo sostuvo la Cámara de
los Lores en el conocido caso de *Bank of England* v. *Vagliano
Bros.,* A.C. 107 (1891). La doctrina inglesa del tomador
ficticio fue trasplantada desde temprano a la jurisprudencia
americana, *Foster* v. *Shattuck,* 2 N.H. 446, 447 (1822), y
vino a formar parte del derecho mercantil de los Estados
Unidos desde antes de redactarse la Ley Uniforme de Instru-
mentos Negociables. Holden, *The History of Negotiable In-
struments In English Law* (1955), págs. 146 y ss.; Britton,
*Bills and Notes,* 2da. ed. (1961), págs. 425 y ss.; Lloyd
Magruder, *"The Fictitious Payee Doctrine Under the Nego-
tiable Instruments Law,"* 17 La. L. Rev. 457 (1957); Brown,
*"Negotiable Instruments—Liability of Bank to Depositor-*

---

(²) *Tatlock* v. *Harris,* 3 T.R. 174 (1789); *Vere* v. *Lewis,* 3 T.R. 182
(1789); *Minet* v. *Gibson,* 3 T.R. 482 (1789); conf. 1 H. Bl. 569 (1791).

*Fictitious Payee,"* 32 Tul. L. Rev. 133 (1957) ; Chalmers, *"Vagliano's Case,"* 7 L. Q. Rev. 216 (1891).

La Ley Uniforme de Instrumentos Negociables fue redactada y aprobada en 1896 por la Conferencia Nacional de Comisionados Sobre Leyes Uniformes. Rige en casi todos los estados de la Unión Americana y en Puerto Rico. Más de veinte estados la han reemplazado por el Código de Comercio Uniforme de 1952. [3] La Ley Uniforme, y por ende nuestro propio estatuto, le añadió un elemento a la regla del tomador ficticio que no contenía el estatuto inglés (Bills of Exchange Act) pero que sí contenía· el antiguo derecho común, o sea, que el hecho de que el tomador fuese ficticio o inexistente debe ser conocido por el librador del documento.

La doctrina del tomador ficticio y la disposición de ley que la recoge cubren una situación anómala. El derecho cambiario clasifica los instrumentos negociables en dos grandes categorías—al portador y a la orden—y en virtud de la doctrina y de la disposición legal mencionadas, un instrumento que de su faz aparece ser pagadero a la orden, se convierte, por ficción de ley, en pagadero al portador. La importancia jurídica de esta distinción estriba en las consecuencias legales que la ley atañe al instrumento en lo que respecta a su negociación. Como se sabe, la ley dispone que un instrumento pagadero al portador puede ser negociado por su mera entrega mientras que si se trata de un instrumento pagadero a la orden es necesario, además de la entrega, un endoso válido

---

[3] Santa-Pinter, *"Objetivos del Uniform Commercial Code,"* Revista de Derecho Mercantil, Madrid, Vol. XXXV, Núm. 88 (1963). Para otros trabajos del Profesor Santa-Pinter relacionados con el tema pueden verse *Código de Comercio de Puerto Rico,* Barcelona, 1963; *"Responsabilidad de las partes en el derecho puertorriqueño de los instrumentos negociables,"* Revista de Derecho Español y Americano, Madrid, abril–junio 1964, pág. 59; *"Negociación y Transferencia de los Instrumentos Negociables en el Derecho Puertorriqueño,"* Boletín del Instituto de Derecho Comparado de México, enero–abril 1964, pág. 83; *"La Letra de Cambio en Puerto Rico,"* Revista de Derecho Mercantil, Madrid, enero–marzo 1964, pág. 35.

del tenedor para que el cesionario pueda adquirir título eficaz sobre el mismo. (⁴)

Como para que pueda considerarse expedido al portador un documento librado a la orden de persona ficticia o inexistente, la ley exije que esa naturaleza del tomador sea de conocimiento del que lo otorga, es natural que siempre en estos casos sean factores claves determinar quién lo otorgó y si el que lo otorgó sabía que el tomador era ficticio o inexistente. Cuando el librador es una persona natural generalmente no se presenta problema alguno una vez que el mismo es identificado. Pero cuando el documento procede de una persona jurídica el asunto puede complicarse pues en esos casos es corriente que varias personas naturales (empleados u oficiales de la persona jurídica) intervengan en una serie de pasos conducentes a la preparación del documento, y aun en la preparación del documento en sí. Por ejemplo, en caso de cheques expedidos en pago de servicios personales, puede darse esta situación: una persona suple los nombres de los empleados a ser pagados; otra, con esa información, hace las nóminas; otra prepara los cheques insertando los nombres y las cantidades; y otra los firma.

En el caso de autos, Jaime Rijos Cruz "preparó nóminas falsas incluyendo en las mismas nombres de personas inexistentes y pasó las nóminas al Tesorero y al Auditor de la Capital de Puerto Rico, José S. García y José Rodríguez Olmo, quienes a base de las nóminas preparadas, sin conocimiento de la actuación del mencionado Subauditor Auxiliar, Jaime Rijos Cruz, y sin tener conocimiento de que dichas nóminas eran falsas, expidieron y firmaron en representación del Gobierno de la Capital de Puerto Rico, como funcionarios autorizados al efecto" (⁵) los cheques en cuestión. Ante esa situación surgen los siguientes interrogantes: ¿Quién es la

---

(⁴) 19 L.P.R.A. sec. 61.

(⁵) Párrafo cuarto de la Estipulación.

persona que, ante la ley, otorgó los cheques? ¿Sabía la persona que los otorgó que los tomadores eran inexistentes?

En el caso de las personas jurídicas intervienen íntimamente dos "personas" en el proceso del otorgamiento. Una es el otorgante nominal, esto es, la institución o corporación que teóricamente emite el instrumento y que es responsable de su pago. La otra es el otorgante real, o sea, la persona natural, el ser humano, que realmente firma el instrumento. Desde luego, normalmente el otorgante real es un empleado o funcionario de la persona jurídica (otorgante nominal) y dicho otorgante real está generalmente autorizado para firmar, a nombre del otorgante nominal, los cheques o instrumentos de que se trate.

■ La jurisprudencia norteamericana ha producido varias reglas en relación con los casos en que se trata de otorgantes que son personas jurídicas. Una de estas reglas es la conocida como la regla de Kentucky o del otorgante real, en cuyo caso "la persona que lo otorgó en esta forma" [6] es el ser humano que realmente firmó el documento, y no la persona jurídica a quien ésta representa. Bajo esta regla para que el instrumento otorgado a nombre de persona ficticia o inexistente sea considerado pagadero al portador, se requiere que el otorgante real sepa que el tomador es ficticio o inexistente. Se requiere también que el otorgante real esté debidamente autorizado a firmar el cheque o instrumento a nombre de la persona jurídica que es el otorgante nominal. El caso normativo de esta regla es el de *Mueller & Martin* v. *Liberty Ins. Bank*, 218 S.W. 465 (1920).

Otra regla jurisprudencial sobre este punto es la conocida como la regla de Missouri o la regla del otorgante formal o nominal. Según esta regla "la persona que lo otorgó en esa forma" es la institución o persona jurídica responsable de la

---

[6] Esa es la frase que utiliza el estatuto. En inglés: "the person making it so payable." En español bastaba decir "la persona que lo otorgó."

emisión del documento y no el ser humano (el otorgante real) que de hecho firmó el mismo. Igual que bajo la regla anterior, también se requiere que el otorgante real esté debidamente autorizado a firmar por el otorgante nominal y que conozca la naturaleza ficticia o de inexistencia del tomador. Bajo esta regla, el conocimiento del otorgante real, de que el tomador es persona ficticia o inexistente, se le imputa al otorgante nominal. *American Sash and Door Co.* v. *Commerce Trust Co.*, 56 S.W.2d 1034 (1932); *Globe Indemnity Co.* v. *First Nat'l Bank*, 133 S.W.2d 1066 (1939).

Una tercera clase de casos de esta naturaleza gira alrededor del concepto de mandato (*agency*).[7] *Goodyear Rubber Co.* v. *Wells Fargo Bank*, 37 P.2d 483 (1934). Para discusiones sobre las reglas que acabamos de mencionar puede verse Nota, 12 Sw. L.J. 250 (1958); Nota, 4 Baylor L. Rev. 356 (1952); Nota, 5 Mo. L. Rev. 514 (1940); Anotación, 118 A.L.R. 15, 36; Anotación, 74 A.L.R. 822, 823. Como puede verse, tanto bajo la regla de Kentucky (o del otorgante real) como bajo la regla de Missouri (o del otorgante nominal), si la persona que firmó el instrumento estaba autorizada para firmarlo y si tenía conocimiento de que el tomador era ficticio o inexistente, el resultado es el mismo: el instrumento se considera pagadero al portador. Sin embargo, la jurisprudencia ha trazado una clara distinción entre aquellos casos en que el agente o empleado tenía facultad para firmar el instrumento a nombre de su principal y aquellos casos en que no la tenía.

■ Puede considerarse como norma general que cuando el empleado o agente tiene facultad para ejecutar el instrumento negociable y lo otorga, a sabiendas, pagadero a un tomador ficticio o inexistente, dicho instrumento se considera pagadero al portador. Por consiguiente, el aceptante que lo paga queda protegido. Por el contrario, cuando el agente o

---

[7] Para un comentario sobre estos términos véase Puig Brutau, *Fundamentos de Derecho Civil*, Tomo II, Vol. 2 (1956), pág. 361.

empleado no está facultado para ejecutar dichos instrumentos, los mismos no se consideran pagaderos al portador. Por lo tanto, en estos casos el aceptante no adquiere título y el patrono o principal puede recobrar la suma envuelta, en ausencia de impedimento o negligencia de su parte. Britton, obra citada, pág. 429 y ss.; Bailey, *The Law of Bank Checks*, 3ra. ed. (1962), págs. 535 y ss.; Nota, 4 Baylor L. Rev. 356, 358–359; Anotación, 74 A.L.R. 822, 823; Anotación, 118 A.L.R. 15, 38.

Recientemente este Tribunal resolvió en *E.M.L. Insurance Company* v. *Banco Popular*, 91 D.P.R. 645 (1965), que unos cheques que el tesorero de una cooperativa, quién estaba facultado para firmar cheques de la misma, hizo a nombre de varios socios de la cooperativa, y los cuales él luego endosó fraudulentamente y cobró, eran cheques pagaderos al portador. Nótese, de paso, que en este caso los tomadores no eran inexistentes, porque existían como personas, pero eran ficticios porque no tenían interés alguno en dichos cheques. Sus nombres fueron utilizados meramente como parte de la treta del otorgante. Pueden darse casos en que los tomadores sean inexistentes y, por ende, ficticios.

El caso de autos es distinto al citado caso de *E.M.L. Insurance Company*, supra, porque los funcionarios del Gobierno de la Capital que firmaron los cheques—para lo cual estaban autorizados—no sabían que los mismos eran pagaderos a nombre de tomadores inexistentes. Lo sabía Rijos Cruz, quién preparó las nóminas falsas, pero éste no era un otorgante ni real ni nominal. Los otorgantes reales, el Tesorero y el Auditor del Gobierno de la Capital, no tenían conocimiento del fraude como tampoco lo tenía el otorgante nominal, el Gobierno de la Capital. De manera que no hay intención ni conocimiento en los otorgantes reales que pueda imputársele al otorgante nominal. Como hemos dicho antes, la jurisprudencia es uniforme en esto. El caso normativo de *American Sash & Door Co.*, supra, es igual al caso de autos.

Un empleado de esa firma preparó nóminas falsas y el tribunal no aceptó la defensa de que los cheques eran pagaderos al portador, basada dicha defensa en que los mismos fueron expedidos a la orden de personas ficticias, ya que el otorgante no tenía la intención de otorgarlos en esa forma. Ni bajo la regla del otorgante real (Kentucky) ni bajo la del otorgante nominal (Missouri) ni bajo la regla del mandato puede hacerse responsable en el caso de autos al otorgante nominal. V. además *Defiance Lumber Co.* v. *Bank of California,* 41 P.2d 135 (1935); *City of N.Y.* v. *Bronx County Trust Co.,* 184 N.E. 495 (1933); *United Cold Storage Co.* v. *Central Mfg. Dist. Bank,* 175 N.E. 825 (1931); *C. E. Erickson Co.* v. *Iowa Nat. Bank,* 230 N.W. 342 (1930); *United Motor Car Co.* v. *Mortgage & Securities Co.,* 128 So. 307 (1930); *Kaszab* v. *Greenebaum Sons' Bank & T. Co.,* 252 Ill. App. 107 (1929); *Caledonian Ins. Co.* v. *National City Bank,* 203 N.Y. Supp. 32 (1924); *Fletcher American Nat. Bank* v. *Crescent Paper Co.,* 139 N.E. 664 (1923); *National Union Fire Ins. Co.* v. *Mellon National Bank,* 119 Atl. 910 (1923); *City of St. Paul* v. *Merchants Nat. Bank,* 187 N.W. 516 (1922); *Los Angeles Investment Co.* v. *Home Savings Bank,* 192 Pac. 293 (1919); *National Surety Co.* v. *Nat. City Bank,* 172 N.Y. Supp. 413 (1918); *North British & Merc. Ins. Co.* v. *Merchants Nat. Bank,* 146 N.Y. Supp. 720 (1914); *Jordon Marsh Co.* v. *Nat. Shawmut Bank,* 87 N.E. 740 (1909); *Shipman* v. *Bank of State of N.Y.* 27 N.E. 371 (1891); Nota, 25 Calif. L. Rev. 616; Anotación, 74 A.L.R. 822, supl. en 118 A.L.R. 15; Anotación, 99 A.L.R. 439.

■ El tercero y último error que señala el demandado-recurrente se basa en que el depositante fue negligente al no descubrir y notificar al banco con prontitud los cargos hechos contra su cuenta debido a los cheques en cuestión. Notemos de inmediato que el caso de autos es distinto al de *Portilla* v. *Banco Popular,* supra. En *Portilla* el empleado hizo cheques falsificando la firma de su patrono. Si bien es cierto que el

Banco debe conocer las firmas de sus depositantes, 75 D.P.R. 114, también es cierto que los depositantes deben conocer sus propias firmas. Por eso, es de esperarse que del examen de los cheques cancelados los depositantes puedan, normalmente y salvo circunstancias extraordinarias, descubrir falsificaciones de sus firmas e informar de ello con razonable prontitud al Banco. Pero en el caso de autos las firmas de los dos otorgantes no fueron falsificadas. Las falsificaciones consistieron de endosos falsos hechos por Rijos Cruz. Es fácil comprender que un depositante no tiene control alguno sobre el número de endosos que sus cheques han de recibir ni tiene medios de verificar, al recibir los cheques cancelados, si esos endosos son legítimos o falsos. Muchas veces, para el depositante los endosos no son otra cosa que nombres desconocidos. Los tribunales están generalmente contestes en que el deber del depositante no se extiende a la verificación de la legitimidad de los endosos en los cheques. *Fultz* v. *First National Bank*, 33 U.S.L. Week 2461 (1965); *Mars* v. *Massanutten Bank of Strasburg*, 285 F.2d 158 (1960); *Coffin* v. *Fidelity-Philadelphia Trust Co.*, 97 A.2d 857 (1953); *Wormhoudt Lumber Co.* v. *Union Bank*, 2 N.W.2d 267 (1942); *National Surety Co.* v. *President and Directors of Manhattan Co.*, 169 N.E. 372 (1929); *Harlem Co-Operative Bldg. & Loan Ass'n* v. *Mercantile Trust Co.*, 31 N.Y.S. 790 (1895); *Shipman* v. *Bank of State of N.Y.*, 27 N.E. 371 (1891); Britton, *Bills and Notes*, 2da. ed. (1961), págs. 407 y ss.; Anotación, 39 A.L.R.2d 641, 655–656; Anotación, 103 A.L.R. 1147, 1151–1154; Anotación, 99 A.L.R. 439, 450; Anotación, 67 A.L.R. 1121, 1125–1126; Anotación, 15 A.L.R. 159, 166–168; Nota, 13 Tul. L. Rev. 300, 302 (1939); Chalmers, *"Vagliano's Case,"* 7 Law Q. Rev. 216, 222 (1891).

No se cometieron los errores señalados. *Se confirmará la sentencia dictada en este caso en 9 de diciembre de 1963 por el Tribunal Superior, Sala de San Juan.*